# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **DARYL THOMAS AGNEW** | |
| Plaintiffs | Civil Action No.: **15-340 (ABJ)** |
| v. | |
| **GOVERNMENT OF THE DISTRICT OF COLUMBIA** | |
| Defendant | |

## PLAINTIFFS' OPPOSITION TO DEFENDANT'S MOTION TO DISMISS

Defendant's motion to dismiss [37] plaintiffs' Third Amended Complaint [35] ("TAC") should be denied because the incommoding statute violates **the second prong of the vagueness doctrine, the** arbitrary and discriminatory enforcement prong, and it is facially invalid. An additional, independent, reason for denying the defendant's motion to dismiss is that the incommoding statute violates due process because it lacks an appropriate *mens rea* requirement on each element. Elonis v. United States, 135 S. Ct. 2001, 2011 (U.S. 2015).

The incommoding statute functions as a loitering statute because there is so little linkage between the vague text of the statute and the officer's authority to issue a move on order. The officer does not even need probable cause to believe that a pedestrian is crowding, obstructing, or incommoding before issuing a move on order. Summary judgment opinion, Bey v. District of Columbia, 2014 CA 3511 B (HBD), August 7, 2015, p. 8, n5. [21-3]. Therefore there is no criteria cabining the officer's discretion to issue a move on order. The statute authorizes any law enforcement officer in the District to order any person standing with at least one foot on a sidewalk or a building entrance, whether partially or totally blocking it,

regardless of whether anyone else is present to be crowded, obstructed, or incommoded, to leave the area for as long as the officer, in their discretion, commands it, on the whim of the officer.

The Supreme Court has never upheld a statute on a vagueness challenge without an appropriate *mens rea* requirement under its modern vagueness doctrine. The same rule holds true in the District courts and the state Supreme Courts. Finally, Supreme Court has never upheld a statute against an "arbitrary and discriminatory" vagueness challenge with a dispersal order under its modern vagueness doctrine.

## I.      Introduction.

### A.   Plaintiffs can prevail on their facial challenge to the incommoding statute without having to satisfy the vague in all its applications test.

Plaintiffs challenge the incommoding statute on the basis of the **second prong of the vagueness doctrine, the** arbitrary and discriminatory enforcement prong. They do not challenge the incommoding statute on the basis of the **first prong, lack of notice.** Therefore, Plaintiffs do not have to show that the statute is vague as applied to them in order to mount a facial challenge. Nor do plaintiffs have to show that the incommoding statute is vague in all of its applications, which is another way of saying the same thing.

The requirement that a challenger show that the statute is vague as applied to them in order to mount a facial challenge, to the extent it survives at all after Johnson v. United States, 135 S. Ct. 2551, 2561 (2015), discussed below, has only been **applied by the Supreme Court** to statutes challenged for vagueness on the basis of the first prong, the notice prong. Article: Vagueness and Police Discretion: The Supreme Court in a Bog, 51 Rutgers L. Rev. at 1296. In fact, the Court has not even consistently applied the "vague as to the challenger" requirement in all of its notice cases. See e.g., Lanzetta v. New Jersey, 306 U.S. 451, 452-58 (1939); Parker, 417 U.S. at 756 (applied test but as Kolender Court pointed out, Parker was a military case with a heightened standard. 461 U.S. at 358-59 n.8). Once the Supreme Court established that the potential for police abuse is an independent ground for invalidation, not just an additional reason for invalidation, the Court expressly held that as a matter of doctrine there was no requirement that the

challenger show that the statute is vague as to them in facial challenges **based on the second prong.** Kolender, 461 U.S. at 358-59 n.8. In footnote 8 the Kolender Court specifically rejected an argument by the dissent that challengers had to show the law was vague as to them.

Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc., 455 U.S. 489, 495 (1982) is also distinguishable. *See* Nat'l Ass'n for Fixed Annuities v. Perez, 2016 U.S. Dist. LEXIS 153214, *99-100 (D.D.C. Nov. 4, 2016)(noting Johnson rejected the vague in all applicatations standard for vagueness challenges). First, it is a pre-enforcement challenge. The Supreme Court has never applied Hoffman's "supposed requirement of vagueness in all applications" in any challenge to a statute based on the second prong of the vagueness doctrine. Johnson, 135 S. Ct. at 2561.

**The incommoding statute was vague as applied to Plaintiffs Agnew and Dennis and Williams.** There are two steps here: One, plaintiffs establish that the incommoding statute is facially unconstitutional under the second prong of the vagueness doctrine. But, as established in their submission (which plaintiffs incorporate by reference herein) below, Plaintiffs do not have to show that the statute is vague as applied to them in order to mount a facial challenge based on the second prong of the vagueness doctrine, as plaintiffs show below. Kolender, 461 U.S. 352, 358 n.8 (1083); Simon H. Rifkind, Article: Vagueness and Police Discretion: The Supreme Court in a Bog, 51 Rutgers L. Rev. 1289 (1999).

Two, plaintiffs bring a damages claim against the District for enforcing ("applying") an unconstitutional statute against them by arresting (Claim 1) and prosecuting (Claim 3) them. *See e.g.*, Fields, 810 F.2d at 834.

## II. The Incommoding Statute.

**The current text of the incommoding statute.** In pertinent part, the "incommoding" statute as amended in 2011 currently reads:

It is unlawful, alone or in concert with others, to **[A] crowd, obstruct, or incommode** [1] the use of any street, avenue, alley, road, highway, or **sidewalk**, or [2] the entrance of any public or private building or enclosure or [3] the use of or passage through any public conveyance, **and [B] to continue or resume the crowding, obstructing, or incommoding after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding.**

D.C. Code[1] § 22-1307(a) (D.C. 2014)(emphasis added).

As the District acknowledges, this provision does not by its terms have a *mens rea* requirement. Memorandum, at p. 18. Duffee, 93 A.3d at 1274. As part of the 2011 Amendments, the City Council consciously chose to eliminate the *mens rea* requirement which the District of Columbia Circuit Court of Appeals had glossed onto it in Adams and the Council replaced the *mens rea* requirement with a "move on" or "cease incommoding" element." Duffee, 93 A.3d at 1274-1276.

## A.  The history of the incommoding statute.

**Text of the former statute.** The incommoding statute has been. The former statute read in pertinent part:

"It shall not be lawful for any person or persons  ... to congregate and assemble in any street, avenue, alley, road, or highway, or in or around any public building or inclosure, or any park or reservation, or at the entrance of any private building or inclosure, and ... to crowd, obstruct, or incommode, [1] the free use of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, or [2] the free entrance into any public or private building or inclosure;

Thus the statute distinguished between incommoding (1) **use of sidewalks**, that is, the free *use* of any such street, avenue, alley, road, highway, or any of the foot pavements thereof, and (2) **access to entrances**, that is, the free *entrance* into any public or private building or inclosure. But, the text of the statute did not provide a *mens rea* requirement for either prong. Nor did it require a dispersal order before arrest for either prong. Subsequent cases construing the statute applied a different *mens rea* requirement for the two different prongs when a mass demonstration was involved.

---

[1] Duffee v. District of Columbia, 93 A.3d 1273, 1274 (D.C. 2014). The penalty is a fine of $500 or 90 days in jail. The Office of the Attorney General of the District of Columbia ("OAG") is the proper authority to prosecute alleged violations of the incommoding statute. D.C. Code § 23-101(b).

1.   Judicial construction of the statute.

The Courts judicially glossed the statute several times applying a different *mens rea* requirement depending on which of the two different prongs was at issue when a mass demonstration was involved. Duffee v. District of Columbia, 93 A.3d 1273, 1275 (D.C. 2014). None of the cases made any inquiry into or explication of the meaning of the terms, "crowd, obstruct, or incommode." In fact, courts routinely treated the three word term ""crowd, obstruct, or incommode" as a unitary term.

In Hunter v. District of Columbia, the Court construed the statute in the context of a challenge to the information which merely restated the words of the statute without any specific factual averments. 47 App. D.C. 406, 1918 U.S. App. LEXIS 2430 (D.C. Cir. 1918). Although the statute did not have an express *mens rea* requirement the Court noted that the use of the phrase "to **congregate and assemble**" imported a *mens rea* into the statute because "at common law the mere act of assembling was not unlawful, unless it was **for an unlawful purpose**." Hunter, at *6 (emphasis added). Therefore, the court observed that the mere act of assembling on the sidewalk without an unlawful purpose was not a violation of the statute. As the Court said, "It would hardly be contended, therefore, that if defendants had met on one of the spacious sidewalks of Pennsylvania Avenue to conduct a peaceable conversation, though in a degree inconveniencing pedestrians, they would be guilty, under the statute, of crowding and obstructing the free use of the walk." Id.

The most import case construing the use of sidewalks prong as opposed to the access to buildings prong is actually the only case construing the pre-amendment "use of sidewalks" prong of the incommoding statute. Adams v. United States, 256 A.2d 563, 564-565 (D.C. 1969) (imposing breach-of-peace element in case involving assembly on public street, to prevent punishment of "sightseers, tourists, or school children" who innocently obstruct use of street).

In <u>Adams</u> the Court held that the language of the statute under consideration here was so broad and covered such a wide spectrum of innocent behavior – for example, stopping on the sidewalk to look at a monument – that it would allow punishment of the members of a group of sightseers, tourists, or school children, who might innocently congregate and assemble on a public street in such a manner as to crowd, obstruct, or incommode the free use of the street." <u>Adams v. United States</u>, 256 A.2d 563, 564-65 (D.C. 1969). Therefore the Court of Appeals held that only "crowding, obstructing, or incommoding" under circumstances which threaten a breach of the peace would constitute a violation of the statute.

The subsequent cases dealt with protestors blocking ***access*** to a building or a driveway in the context of a mass demonstration.

In <u>Odum v. District of Columbia</u> the information charged the defendant with "congregating and assembling with others . . . and . . . crowding, obstructing and incommoding the free use of said thoroughfare by failing to move to permit a dump truck entrance into the driveway. . . ." <u>Odum</u>, 565 A.2d 302, 303 n.3 (D.C. 1989). The jury found defendant guilty and the trial court entered a judgment of conviction. <u>Odum</u>, 565 A.2d at 302. The trial court ruled that incommoding and assembly for an unlawful purpose were separate offenses and so assembly was not an element of incommoding. The Court of Appeals reversed on this point citing <u>Hunter</u> for illustrating the "essential link between incommoding and assembly for an unlawful purpose." <u>Odum</u>, 565 A.2d at 304 n.5. The Court of Appeals ultimately reversed the conviction because the evidence showed that the defendant had acted alone in blocking access to the driveway to the building site. 565 A.2d at 302.

Besides holding that the "congregating and assembling" element required at least three people the <u>Odum</u> Court also held that the "unlawful purpose" *mens rea* requirement applied to the "access" prong of the incommoding statute in the context of demonstrations. <u>Id.</u>

The next major pre-amendment decision construing the incommoding statute was <u>Tetaz v. District of Columbia</u>, 976 A.2d 907, 910 (D.C. 2009) which was also an access case. In <u>Tetaz</u> the defendants had assembled in front of the entrance to the Rayburn Building intending to impede access into the building as a protest. 976 A.2d 910. Defendants argued that the evidence was insufficient to support their convictions because the government had not established the *mens rea* requirement of "breach of the peace."

The <u>Tetaz</u> Court refused to impose a breach-of-peace element in a case involving the intentional impeding of entry into a congressional office building. 976 A.2d at 910-12. The court held that appellants' purpose to impede entry was adequately shown where twenty-five demonstrators lay in front of the Independence Avenue entrance to the Rayburn Building "blocking [the entrance] completely," and that purpose supported a conviction under the **access** prong of the incommoding statute without proof of an actual or imminent breach of the peace. 976 A.2d at 910-12.

The <u>Tetaz</u> Court distinguished <u>Adams</u> where the Court did require proof of an intent to breach the peace to support a conviction under the incommoding statute because *Adams* "apparently included no blocking of a building entrance." 976 A.2d at 912. The <u>Tetaz</u> Court held that the concern of the <u>Adams</u> Court was to protect from arrest and prosecution people "who might innocently congregate and assemble on a public street in such a manner as to crowd, obstruct, or incommode the free use of the street." <u>Tetaz</u>, 976 A.2d at 912 *citing* <u>Adams</u>, 256 A.2d at 564-65. The <u>Tetaz</u> Court concluded that "the corresponding limitation the [<u>Adams</u>] court read into the statute, has no bearing on application of the unlawful assembly statute to punish the deliberate impeding of entry into a public building."

**A. The 2011 Amendments to the incommoding statute.**

**1. Revised Incommoding Statute enacted by the City Council**

The major changes to the statute enacted by the 2011 Amendments were (1) the eliminating of the "congregate and assembly" element (which also eliminated the "unlawful purpose" *mens rea* element imported from common law unlawful assembly) , (2) the retention of the broad and vague terms "**crowd,**

obstruct, or incommode" as the operative words of the statute instead of using the narrower term "block"; (3) eliminating any *mens rea* element; and (4) substituting a "dispersal order" or "move on order" for the *mens rea* requirement (but rejecting any narrowing qualifications such as duration qualifications on the dispersal order).

The Court of Appeals reviewed the revised incommoding statute enacted by the City Council in Duffee, 93 A.3d at 1275. The Court rejected a request by defendants to gloss a breach of the peace *mens rea* requirement or any other *mens rea* requirement onto the statute because "the legislative history of the revised version of § 22-1307 confirms what the plain language of the provision suggests: the D.C. Council did not intend to impose a breach-of-the-peace element." Duffee, 93 A.3d at 1273-1275. The defendants in Duffee did not raise any other objections to the constitutionality of the incommoding statute, *e.g.*, a vagueness challenge under Morales, nor did the Court raise any issues *sua sponte*.

### III.     The Void For Vagueness Doctrine.

#### A.  The Vagueness Doctrine: two prongs but overlapping doctrines.

The void for vagueness doctrine in its current formulation has two prongs: a law is unconstitutionally vague if its lack of definitive standards either (1) fails to apprise persons of ordinary intelligence of the prohibited conduct, or (2) encourages arbitrary and discriminatory enforcement. *See, e.g.,* Grayned v. City of Rockford, 408 U.S. 104, 108 (1972). Although the Supreme Court expresses the two prongs in the disjunctive as though they were two separate and independent doctrines, and the Court continues to treat each prong as an element to be analyzed separately, as they have evolved they do not separate neatly conceptually, and so the analysis of these two prongs tends to overlap. As Justice Scalia wrote in dissent in Morales, "The vagueness that causes notice to be inadequate is the very same vagueness that causes 'too much discretion' to be lodged in the enforcing officer." "Put another way: A law that gives the policeman clear guidance in all cases gives the public clear guidance in all cases as well." Id. at 95 (Scalia, J., dissenting).

An examination of the evolution of the doctrine shows that although the doctrine is formulated in the disjunctive, the doctrines underlying the two prongs still overlap.

Traditionally, the dual prongs of the vagueness doctrine were seen as part of the same doctrine: a statute that was written so poorly or broadly that it failed to give notice to citizens about what was prohibited also vested too much discretion in police to decide what conduct was illegal. Kolender v. Lawson, 461 U.S. 352, 357 (1983) (discussing the dual prongs of vagueness doctrine in tandem). Of those cases decided squarely under the doctrine, most invalidated ordinances under both prongs.

The Court did not begin to invalidate cases on the second prong of the vagueness doctrine until cases like Papachristou v. City of Jacksonville, 405 U.S. 156 (1972) and Coates v. Cincinnati, 402 U.S. 611, 614 (1971). But, in these early "second prong" cases the arbitrary and discriminatory treatment prong was just an additional reason to invalidate a statute, not an independent ground for invalidation.

But, in Kolender, for the first time the Supreme Court elevated the second prong **into an independent ground for invalidation**, not just an additional *reason* for invalidation. Kolender, 461 U.S. at 361. Since Kolender, the Supreme Court says that the second prong - the encouraging arbitrary and discriminatory enforcement prong - is the more important prong. Id. Still, even though Kolender was based only on the arbitrary-enforcement prong, Kolender did not suggest any disunity between the two prongs. Indeed, Kolender failed to discuss the notice prong at all.

In Morales the evolution of the doctrine came full circle and the Court showed for the first time that the two prongs could be decided differently by holding that the Chicago statute provided adequate notice but fostered arbitrary and discriminatory enforcement. City of Chicago v. Morales, 527 U.S. 41, 60 (1999). Morales illustrates that even persons who (at least theoretically) were sufficiently on notice of the nature of the offense might have been singled out for arrest and prosecution for arbitrary or discriminatory reasons. Proof of this point is the fact that the majority in Morales invalidated the Chicago loitering-plus

ordinance in that case on the basis of the **second prong of the vagueness doctrine, the** arbitrary and

discriminatory enforcement prong, <u>City of Chi. v. Morales</u>, 527 U.S. 41, 60-64 (1999), but did not

invalidate the statute on the basis of the first prong of the vagueness doctrine, the "lack of notice" prong. <u>Id.</u>

at 56-60. So, the Chicago ordinance was not vague as to notice as to *anyone*, but it was vague as to lacking

standards **as to everyone, or at least, practically everyone**.

This result illustrates another reason that the notice prong is diminishing in importance: the

rationale for it -- that a well drafted law puts people on notice of what the law is -- is in many cases a legal

fiction that contains too much fiction and not enough legal. An ordinary person without legal training

cannot know a law and all the regulations and judicial glosses interpreting it. And, as Justice Kennedy (who

for an unexplained reason did not join Section IV of Morales, the section in which the plurality contended

that the statute failed to give adequate notice) points out in his concurrence, "some police commands will

subject a citizen to prosecution for disobeying whether or not the citizen knows why the order is given.

Illustrative examples include when the police tell a pedestrian not to enter a building and the reason is to

avoid impeding a rescue team, or to protect a crime scene, or to secure an area for the protection of a

public official." <u>Morales</u>, 527 U.S. at 69(Kennedy, J. concurring). So, it is illogical to say that the "notice"

rationale is satisfied when the real reason a person has to obey a police order is because the police officer

says so. In fact, a person only has to obey lawful police orders and if the police officer does not explain the

why behind their order a pedestrian cannot know if it is lawful. A person has no obligation to follow every

order a police officer issues. *See e.g.*, <u>Wilson v. Martin</u>, 549 Fed. Appx.309, 311 (6th Cir. 2013)(no

probable cause to arrest the plaintiff for obstruction for failure to comply with an order because "the

officers had no legal basis to order [plaintiff] to stop in the first place."); <u>Streit v. District of Columbia</u>, 26

A.3d 315, 319-20 (D.C. 2011)(conviction for failure to obey a "lawful order" under 18 DCMR § 2000.2

(2006) reversed because the officer's the order to disperse was not "lawful" ).

As explained below, this faulty legal fiction underlying the notice prong of the vagueness doctrine explains why the dispersal order does not cure a standardless statute. And this faulty legal fiction also explains why pedestrians in the District of Columbia frequently are shocked when an officer orders them to move on for crowding, obstructing, or incommoding. "The vagueness that causes notice to be inadequate is the very same vagueness that causes 'too much discretion' to be lodged in the enforcing officer." Id. at 95 (Scalia, J., dissenting). People do not know that innocent (i.e., unintentional incommoding) is unlawful because the statute does not put them on notice because it punishes even the group of friends who stop to chat on a broad avenue and who, without intending to do so, nonetheless incommode others, Hunter, 1918 U.S. App. LEXIS 2430, *6, and so they have no notice that they are breaking the law when the police order them to move on. As a practical matter, the move on order substitutes an analysis of whether a person is violating the incommoding statute with a separate and independent dispute over whether a person has to obey a move on order.

In another twist in the evolution of the doctrine the Supreme Court recently evaluated the "residual clause" of the Armed Career Criminal Act of 1984 (which defines the term "violent felony" to include any felony that "involves conduct that presents a serious potential risk of physical injury to another.") under both prongs of the vagueness doctrine and found that the clause both denies *fair notice to defendants* and *invites arbitrary enforcement by judges* – after holding for nine years that it was not vague, which led the Court to conclude that "common sense is a much less useful criterion than it sounds." 135 S. Ct. 2551, 2557, 2559 (2015).

**Connection between racial discrimination and modern loitering ordinances in the Court's vagueness jurisprudence.** There is a strong connection between the Supreme Court's concern about racial discrimination and modern loitering ordinances in the Court's opinion as the context in which Morales and cases like it were decided - including Papachristou and Kolender, as well as Shuttlesworth v. City of Birmingham and Coates v. City of Cincinnati - suggest. In each of these seminal cases, a foundation for the

development of the arbitrary-enforcement doctrine, the Court invalidated ordinances used as vehicles for state racism or enforced primarily against minorities. In <u>Papachristou</u>, the Court had even explicitly grounded arbitrary enforcement jurisprudence on the concern that police vested with too much discretion would target anyone out of favor with the majority. <u>Id</u>., 405 U.S. at 171. This explains why the doctrine is perfectly suited to cure problems such as Officer Norris' and the other officers' arresting young Black men because of their race – the statue allows – even encourages – arbitrary and discriminatory enforcement against minorities such as the poor and African American men.  <u>Kolender v. Lawson</u>, 461 U.S. 352, 361.

This discrimination extends to any person deemed "undesirable" by the "in-group," <u>Papachristou</u>, 405 U.S. at 171, and the homeless. <u>Desertrain</u>, 754 F.3d at 1156 (striking down on vagueness grounds – bath prongs - statute selectively applied to the homeless).

### B.  <u>City of Chicago v. Morales</u> and the "loitering" plus ordinance

In <u>Morales</u> the Supreme Court struck down as facially invalid under the second prong of the vagueness doctrine, that is, the arbitrary and discriminatory enforcement prong. a City of Chicago gang loitering ordinance ("a loitering plus" ordinance, that is a statute which attempts to combine the offense of loitering with another offense) which allowed police to arrest any group of two or more people who remained in a public place "with no apparent purpose" if the police "reasonably believed" the group included a gang member and if the loiterers failed to disperse after a police order to do so. 527 U.S. at 47. Dividing six votes to three, in Section V of the opinion, a majority of the <u>Morales</u> Court held that the "broad sweep" of the statute failed to adequately curtail police enforcement discretion, and thus it violated the second prong of the vagueness doctrine, that is, the arbitrary and discriminatory enforcement prong. 527 U.S. at 60-64 (Section V).

The three step analysis of the <u>Morales</u> Court was: (1) is the language of the statute vague, either because the meaning of its terms were unclear or lack a standard or they are overbroad; (2) if yes, is there a

*mens rea* requirement to cabin the discretion of the arresting officer; (3) if no *mens rea* requirement, then a "dispersal order" will not save the overbroad (*i.e.*, vague) statute because, absent an appropriate *mens rea* requirement, a "dispersal order" element magnifies the police officer's discretion rather than limiting it.

The starting point of the Court's analysis of the statute's vague language was the "broad sweep of the ordinance," which "does reach a substantial amount of innocent conduct." Morales, 527 U.S. at 60. The next step in the <u>Morales</u> Court's analysis was an examination of the operative language to determine if it "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." 527 U.S. at 60 *citing* <u>Kolender</u>. Since the text of the statute did not have a *mens rea* requirement and the Illinois Supreme Court had declined to place a narrowing gloss on the ordinance, discussed below, the only possible "guideline" in the text to cabin an arresting officer's enforcement of the statute was the "dispersal" order element. 527 U.S. at 61.

Refusal to obey a dispersal order was the "trigger" in the ordinance that authorized an arresting officer to order a dispersal or to make an arrest. 527 U.S. at 61. The City argued that the text of the ordinance limits the officer's discretion in three ways because of the "dispersal order" element. 527 U.S. at 61. First, it does not permit the officer to issue a dispersal order to anyone who is moving along or who has an apparent purpose. 527 U.S. at 61. Second, it does not permit an arrest if individuals obey a dispersal order. 527 U.S. at 61. Third, no order can issue unless the officer reasonably believes that one of the loiterers is a member of a criminal street gang. 527 U.S. at 61.

The Court explained that a dispersal order does not save a vague ordinance because if the statute is vague and lacking in guidelines to cabin discretion in the first place then a dispersal order issued on the basis of the ordinance will also be an exercise of discretion un-cabined by any limits. <u>Morales</u>, 527 U.S. at 62-63. The Court summarily dismissed the first two reasons as tautologies.  527 U.S. at 61-62. That the ordinance does not apply to activity that would not constitute loitering under any possible definition of the term does not even address the question of how much discretion the police enjoy in deciding which

stationary persons to disperse under the ordinance. 527 U.S. at 61-62. Similarly, that the ordinance does not permit an arrest until after a dispersal order has been disobeyed does not provide any guidance to the officer deciding whether such an order should issue in the first place. 527 U.S. at 62. The "no apparent purpose" standard for making that decision is inherently subjective because its application depends on whether some purpose is "apparent" to the officer on the scene. 527 U.S. at 62.

The Court conceded that the requirement that the requirement that an officer reasonably believe that a group of loiterers contains a gang member before ordering a dispersal does place *some* limit on the authority to order dispersal. 527 U.S. at 62. But, the Court continued that a dispersal order element might cabin discretion in a statute that was not vague or had a *mens rea* requirement. 527 U.S. at 62. Thus, the Court recognized that the broader the sweep of an ordinance, the less effective a warning or a dispersal order is a guideline to limit discretion. Morales, 527 U.S. at 62-63. If the statute has no standards then the dispersal order is independent of the operative language of the statute and has no standards whatsoever. Id. as Justice Kennedy put it, "The predicate of an order to disperse is not, in my view, sufficient to eliminate doubts regarding the adequacy of notice under this ordinance. 527 U.S. a6 69(concurring).

**Distinction between the role of the dispersal order in the two different prongs of the vagueness doctrine.** It is important to note that the Court made a distinction in its analysis of the role of the dispersal order in the two different prongs of the vagueness doctrine. The vagueness doctrine has two prongs, the **adequate notice** prong, and the arbitrary and discriminatory enforcement prong. The Court analyzed the role of the dispersal order as a defense to a vagueness challenge separately under each prong. In section IV of the opinion the Court analyzed whether the dispersal order provided adequate notice. 527 U.S. at 56-60. The Morales Plurality **did believe** that the Chicago ordinance violated the **adequate notice** prong because the dispersal order, if unfounded, was itself an unjustified impairment of liberty, and because it compound the inadequacy of the notice afforded by the ordinance. 527 U.S. at 58. But, the plurality could not muster enough votes for a majority on this prong. So, the *majority* of the Morales Court did not hold that the

Chicago ordinance violated the **first prong** of the vagueness doctrine, that is, the adequate notice prong. But it is worth notice that Justice Kennedy, even though he did not join Section IV nonetheless did not think that the dispersal order provision really gave "notice" to people. <u>Morales</u>, 527 U.S. at 69(Kennedy, J. concurring). He conceded that in most cases people follow dispersal orders without knowing the reason for them. <u>Id.</u>

But, a six Justice majority analyzed the dispersal order under the second prong of the vagueness doctrine, that is, the arbitrary and discriminatory enforcement prong, and the <u>Morales</u> Majority held that the dispersal order **in the vague ordinance without an appropriate** *mens rea* **requirement magnified, rather than limited, the arresting officer's enforcement discretion.** 527 U.S. at 61-64.

So, the take away here is that although the dispersal order does provide notice about what the police officer thinks, **it does not place limits on their enforcement discretion when the statute lacks a** *mens rea* **requirement .** In fact, Justice O'Connor suggested in her concurrence that one way to remove at least some of the vagueness from the statute would be to include a "harmful intent" *mens rea* element. 527 U.S. at 67.

IV.     **The District's Incommoding Statute Is Void For Vagueness.**

The District's incommoding statute is unconstitutionally vague under the second prong of the vagueness doctrine, the arbitrary and discriminatory enforcement prong, for the same reasons as the Chicago "loitering" plus ordinance which the <u>Morales</u> Court invalidated, that is, the "broad sweep of the" statute reaches a substantial amount of innocent conduct and the text of the statute lacks any "minimal guidelines to govern law enforcement." <u>Morales</u>, 527 U.S. at 60, *citing* <u>Kolender v. Lawson</u>, 461 U.S. 352, 358 (1983); there is no appropriate *mens rea* requirement, and the move on order magnifies the arresting officer's already unfettered discretion. the District's contention that the statute does have a *mens rea* element – the move on order, Memorandum, p. 14-15 – is wrong on three counts. The <u>Duffee</u> Court says

that it doesn't; the move on order is not a *mens rea* element, and the move on order by its text does not expressly have a *mens rea* element. **The** move on order is not a *mens rea* element **because the fact that the ordinance does not permit an arrest until after an individual has been requested to move on does not provide any guidance to the officer as to whether a request should be made in the first place.** Leal v. Town of Cicero, 2000 U.S. Dist. LEXIS 5860, *7-8 (N.D. Ill. Mar. 31, 2000).

The problem with an "obstructing the sidewalk" statute which regulates conduct as pervasive and fundamental as using the sidewalk, is, in the words of the Washington Supreme Court, that many "innocent intentional acts [of using the sidewalk] ... merely *consequentially* block sidewalk traffic or cause others to take evasive action." Seattle v. Webster, 802 P.2d 1333, 1338 (Wash. 1990) (deciding a "vagueness challenge to Seattle, Washington's "pedestrian interference ordinance") (emphasis in original).

No matter where you go, there you are, so simply occupying space on the sidewalk "crowds, obstructs, or incommodes" it for others.

For example, Mr. Agnew was arrested for incommoding because he had stopped to chat with a friend on the sidewalk in the yard of his garden apartment and he and his friend stepped aside every time another pedestrian came by. TAC, ¶ ¶ 86-101. Mr. Bugg Bey was by himself with no pedestrians in sight when he was arrested standing in a private yard with the permission of the owner *next* to the sidewalk. TAC, ¶ ¶ 108-128. Likewise, Mr. Dennis was arrested because he had stepped outside for a moment to catch a breath of fresh air and he was alone on the sidewalk. TAC, ¶ ¶ 134-149. Ms. Williamson was hanging out on a commercial street. TAC, ¶ ¶ 157-172. The young man arrested in Starburst Intersection Plaza was just sitting on a low wall designed to serve as a park bench in an empty park at 10 p.m. at night. TAC, ¶ ¶ 77-85. They were not "blocking" passage by any means but perhaps they were hindering or impeding it.

This is the overbreadth problem in the statute the District of Columbia Court of Appeals described and addressed almost fifty years ago back in 1969 in <u>Adams v. United States</u>, 256 A.2d 563, 564-65 (D.C. 1969). In <u>Adams</u> the District of Columbia Court of Appeals had recognized that without a *mens rea* requirement the scope of the statute was so broad that a straight forward application of the language would reach even friends who stopped on the street to chat or a group of tourists who stopped to look at a monument and unwittingly obstructed part of the sidewalk, and so the Court of Appeals glossed a breach of the peace *mens rea* requirement into the statute. <u>Id</u>.

In fact, a District of Columbia court realized even earlier, in 1918, that without an appropriate *mens rea* requirement, the incommoding statute is so broad that a group of friends who "met on one of the spacious sidewalks of Pennsylvania Avenue to conduct a peaceable[2] conversation," and in a degree inconveniencing pedestrians, would be guilty, under the statute, of crowding and obstructing the free use of the walk." <u>Hunter</u>, 1918 U.S. App. LEXIS 2430, *6.

### A. The text of the Incommoding Statute is vague.

The District concedes that the only guidelines in the incommoding statute to cabin an officer's discretion are the dictionary definitions of the three operative words, "crowd, obstruct, or incommode." Memorandum, p. 9.

But simple reliance on dictionary meanings is not enough to save a statute from a vagueness challenge especially when the statute has only one (or three) operative word(s). The District offers dictionary definitions for the words but no analysis of how the words provide a standard. A statute can be vague not only because the word does not specify a standard but because the standard is subjective and the statute does not specify who supplies the standard.

---

[2] In this context, "peacable" means without an unlawful purpose."

For example, the Supreme Court struck down an ordinance using the word "annoy" in <u>Coates v. City of Cincinnati</u>, 402 U.S. 611 (1971). The city ordinance made it a criminal offense for three or more individuals to assemble on public sidewalks and conduct themselves in a manner which might "annoy" passersby. The Ohio Supreme Court had held that the statute was not vague in the light of its well-understood dictionary definition of "annoy" which the Ohio court held to mean "to trouble, to vex, to impede, to incommode, to provoke, to harass or to irritate." Looking first at the word "annoy," the Supreme Court pointed out that some vagueness inheres in the word because it is subjective because what might annoy one person might not annoy another.  But, a second defect doomed the statute: the failure to specify whose sensitivities are relevant. The ordinance did not specify and the Ohio Supreme Court "did not indicate upon whose sensitivity a violation does depend -- the sensitivity of the judge or jury, the sensitivity of the arresting officer, or the sensitivity of a hypothetical reasonable man". 402 U.S. at 613. As explained below, the incommoding statute suffers from the same vagueness beyond the vagueness inhering in the dictionary definition of the terms.

In another single word case the Supreme Court held that a statute requiring a person to provide a "credible and reliable" identification to a police officer on demand was vague because the statute contained no standard for determining what a suspect had to do in order to satisfy the requirement to provide a "credible and reliable" identification. <u>Kolender v. Lawson</u>, 461 U.S. 352, 358. The statute was unconstitutionally vague on its face because it encouraged arbitrary enforcement by failing to describe with sufficient particularity what a suspect must do in order to satisfy the statute. <u>Kolender v. Lawson</u>, 461 U.S. 352, 361.

The lack of an appropriate *mens rea* requirement can make a statute's words vague. For example the statute in <u>Morales</u> defined loitering as loitering or standing in one place as no apparent purpose. As Justice Breyer pointed out, "Since one always has some apparent purpose, the so-called limitation invites, in fact requires, the policeman to interpret the words "no apparent purpose" as meaning "no apparent

purpose except for . . . ." And it is in the ordinance's delegation to the policeman of open-ended discretion to fill in that blank that the problem lies." <u>Morales</u>, 527 U.S. at 70 (concurring). The incommoding statute lacks an appropriate *mens rea* requirement so it is effectively defined as crowding, obstructing, or incommoding with no apparent purpose, so it is in the statute's delegation to the policeman of open-ended discretion to fill in that blank that the problem lies.

The incommoding statute is vague because although people can look up the words in a dictionary there are so many definitions and the definitions cover so much conduct that they do not supply a standard to the describe with sufficient particularity what a suspect must do in order to satisfy the statute because the statute provides no guidance on which definition to choose. <u>Kolender</u>, 461 U.S. at 361.

Similarly, in <u>Smith v. Goguen</u> the Court held invalid a statute imposing criminal liability on one who, *inter alia*, "publicly . . . treats contemptuously the flag of the United States. . . ." <u>Smith v. Goguen</u>, 415 U.S. 568 (1974). Again the statute was held impermissibly vague because the standard depended on nothing more than the preference of the police, the court, and the jury for treatment of the flag. <u>Smith</u>, 415 U.S. at 578. A key reason for the Court's finding that the statute was vague is that because the "treats contemptuously" phrase is language of "such a standardless sweep it allows policemen, prosecutors, and juries to pursue their personal predilections." Id. at 575. Court noted that a person who treated the flag contemptuously on purpose as a rain cover would likely be prosecuted but a person who engaged in the same behavior reluctantly without a bad motive would probably not be. Id. at 575-76.

The incommoding statute also lacks any legislative history which cabins the officer's discretion for example, by linking it to directing vehicular traffic. See e.g., 18 DCMR § 2000.2 (2011) (failure to obey statute police officer orders which limits orders to (1) "lawful" orders (2) relating to traffic); <u>Shuttlesworth v. Birmingham</u>, 382 U.S. 87, 93, (1965)(discussing similar statute). Instead, the Committee Report evinces an intent to imbue the operative terms with the broadest possible scope by expressly rejecting the use of the

objective term "block" proposed by all groups which advised the Council in its attempted reform of the statute and instead the Council retained the subjective terms "crowd, obstruct, or incommode."

Because this statute was enacted by the D.C. Council rather than by Congress, in evaluating a facial challenge to it, a federal court must consider any limiting construction that the highest state court, has placed on the statute.[3] Morales, 527 U.S. at 61; Smiley v. Kansas, 196 U.S. 447, 455 (1905). But, no District court has ever put a limiting gloss on the words of the statute. In fact, by deleting the "to congregate and assemble" element the D.C. Council pulled out by the roots the "unlawful purpose" element which the Hunter Court had recognized back in 1904 had imported the *mens rea* element from the common law unlawful assembly. Similarly, the only limitation ever put on the incommoding statute was engrafting a *mens rea* element into the statute, Adams, but the D.C. Council stripped it out in the 2011 amendment.

None of the District cases construing the incommoding statute shed any light on the meaning of the operative words or their direct object, the phrase "use of [the] ... sidewalk." The real take away from the District of Columbia Court of Appeals cases in terms of what the operative words in the statute mean is that even the District of Columbia Court of Appeals does not find the terms definite enough to use them to describe the conduct it believes is covered by the statute. Odum, Tetaz v. District of Columbia, 976 A.2d 907, 911 (D.C. 2009), Duffee v. District of Columbia, 93 A.3d 1273, 1274 (D.C. 2014). Moreover, the Court almost always uses the three words together as one "fused" term that describes a range of conduct from partial to total blocking and the word "incommode" is used as shorthand to mean all three.

---

[3] For purposes of appellate review under 28 U.S.C. § 1257, the local courts of the District of Columbia are treated as state courts. *See* District of Columbia Court Reform and Criminal Procedure Act of 1970, Pub. L. No. 91-358, § 172(a)(1), 84 Stat. 590; see also D.C. Court of Appeals v. Feldman, 460 U.S. 462, 463-464 (1983). Moreover, panhandling statute was enacted by the D.C. Council not Congress.

Only two of the reported cases are "sidewalk cases" and they focus on intent issues. <u>Hunter</u>; <u>Adams</u>, *supra*. Neither of these two cases analyzed the term "use of [the] ... sidewalk" or attempted to divine whether a person can "crowd, obstruct, or incommode" when no one else is on the sidewalk.

The other reported cases are "access" cases in which groups of protestors purposefully blocked entrances to buildings or lots as opposed to incommoding the use of the sidewalk. <u>Odum</u>, <u>Tetaz</u>, <u>Duffee</u>.

In <u>Tetaz</u>[4] the Court, as opposed to the trial court or witnesses or parties, **does not even use "crowd, obstruct, or incommode" to describe the offense of "crowding, obstructing, or incommoding" the entrance to a public building.** <u>Tetaz v. District of Columbia</u>, 976 A.2d 907, 911 (D.C. 2009). Instead, the Court uses some form of the terms "blocking or impeding" entry into a public building or some form of block or impede alone. <u>Id.</u> at *passim*.

Similarly, the <u>Duffee</u> Court used the word "impede" to describe the conduct of a group of about 200 protestors who congregated on the White House sidewalk and thereby "impeded the flow of foot traffic in the area and prevented people unassociated with the demonstration from having free access to the White House sidewalk." <u>Duffee v. District of Columbia</u>, 93 A.3d 1273, 1274 (D.C. 2014). It is not even clear from the Court's description whether the group completely or only partially blocked "free access" to the sidewalk or what the use of the word "free" adds to the meaning of "access." Another oddity is that the statute prohibits incommoding the "use of [the] .. sidewalk" or "the entrance of any .. building" but nowhere uses the word "access."[5] The <u>Duffee</u> Court refers to the incommoding statute by using the term "the statute prohibiting the blocking of passages" and "blocking passage" as one thing that the statute

---

[4] In <u>Tetaz</u> the **trial judge** appeared to use incommode as a synonym when it found that, "while not 100 percent blocked, [the building entrance] was significantly impeded or incommoded" because "people had to pick their way around individuals lying on the ground in sheets," some "less than two or three feet . . . from the entryway," and also found that "clearly block[ed] a series of doors [on the Independence Avenue side of the Rayburn Building], 70 percent, even though it doesn't physically prevent anyone from walking in, does incommode." 976 A.2d at 911.

[5] The former version prohibited the incommoding of "the free use of any ... sidewalk" or "the free entrance into any ... building or inclosure."

prohibits. "Blocking passage" is the name the 2011 Amendment gave the amended incommoding statute. Committee Report, p. 100. But, the D.C. Council expressly rejected the use of the term "block" in the statute.

In <u>Odum</u> the District of Columbia Court of Appeals wrote that, "After he [appellant] obstructed the entry of a dump truck into a construction site [by failing to move to permit a dump truck entrance into the driveway], appellant was found guilty of unlawful assembly for the purpose of incommoding the free use of a driveway."

The Court's use of non-statutory words to describe conduct it believes is prohibited by the statute without specifying which of the three words it means increases the vagueness.

These dictionary definitions do not provide sufficient standards to cabin an arresting officer's discretion. Moreover, the D.C. Council broadened the scope of the statute by eliminating the "to assemble or congregate" language and replacing it with the phrase "alone or in concert with others." The District also magnified the officer's discretion in enforcing the statute by stripping the *mens rea* element inserting an unqualified dispersal order in its place.

Another significant problem with the words, "crowding, obstructing, or incommoding" is that each one has multiple dictionary definitions which are different and even mutually exclusive. For example, even the District concedes that "obstruct" means both to partially block and to totally block a sidewalk. Memorandum, p. 11. So the officer has to choose, the evil identified by Justice Breyer in <u>Morales</u>. 527 U.S. at 70 (concurring).

Almost every group involved in advising the D.C. Council on revising the incommoding statute suggested replacing the three word phrase "crowd, obstruct, or incommode" with the single word, "block."

But, the Council rejected the term "block" because it "is narrower than the conduct included in "crowding" and "incommoding."" The Council retained the word "obstruct," because "The term "obstruct" appears in the dictionary[6] to be a broad term that includes "impede," "hinder," and "block"" Committee Report, p. 6-7. So, obstruct does not mean only "obstruct," it also "includes "impede," "hinder," and "block."" Id.

According to Websters, "obstruct" means: (1) to block or close up by an obstacle; and (2) to hinder from passage, action, or operation. "Hinder" also has two meanings: (1) to make slow or difficult the progress of; and (2) to hold back. "Impede" means to interfere with or slow the progress of. "Block" means "make the movement or flow in (a passage, pipe, road, etc.) difficult or impossible."

Based on which definition of obstruct one chooses, it either means to "totally" block the sidewalk, in the sense that no one can get by, or to "partially" block the sidewalk, so that other people have to go around can still get by. So, does the statute prohibit partial blocking? Or just total blocking. Or both? Who knows? This ambiguity is a major reason the phrase is vague. Having to choose between two definitions without guidance is not a standard. The District even cites to a case that makes this point – ANSWER v. District of Columbia, 905 F. Supp. 2d 317, 345-47 (D.D.C. 2012). Similarly, a law that distinguished between "event" and "non-event" signs was unconstitutionally vague because it defined "event" such that it delegated almost complete administrative discretion to enforcement officers. Id.

Another cause of vagueness in the incommoding statute is whether it applies when other people are around. Does it prohibit only actual blocking when other pedestrians are using the sidewalk or does it also prohibit "anticipatory" blocking the use of a sidewalk when no other pedestrians are there? Or both? The statute leaves it up to the officer on the beat – without guidance.

---

[6] The Council used the "Webster's New Universal Unabridged Dictionary, Second Edition (1983)."

Mr. Dennis was all alone on a walkway wide enough for three when he was arrested. But Ms. Williams was arrested for standing on a commercial street so that other pedestrians had to go around her. Again, this is the type of vagueness and lack of guidance which provides a cover for arbitrary enforcement and discriminatory enforcement.

Ms. Williams was standing on the sidewalk hindering and perhaps impeding other pedestrians in the sense that they had to walk around her. The incommoding statute prohibits hindering other persons. Or does it?

The object of the three verbs – "crowd, obstruct, or incommode" – is not persons but the "*use*" of any sidewalk. But does use mean use by another person when that person is on the sidewalk actually using it? Or does it include anticipatory blocking so that it means blocking the use of the sidewalk in the abstract even when others are not around in the sense of interfering with that their right to use it?[7]

Obviously, the MPD enforces the incommoding statute as though it includes anticipatory partial blocking when only one person is involved. The MPD arrested Mr. Dennis for standing alone on a wooden walkway wide enough for two or three people to walk by when no one else was around. TAC ¶ 81-92. Several MPD officers arrested one young black at Starburst Intersection Plaza 1550 Maryland Ave NE, Washington, DC 20002 during regular park hours for "crowding, obstructing, or incommoding " while chatting with friends and sitting on low wall on edge of walkway like the figure in yellow shirt and blue pants at paragraph 28 of the TAC. The police arrested him even though all the other men left when ordered to do so. TAC ¶ 54-60. They were not blocking the passage of anyone. But were they blocking the use? And was the one young man who refused to leave blocking the use by himself when he continued to sit on the wall by himself when the others left?

---

[7] Websters provides several definitions of "use" including: "the legal enjoyment of property that consists in its employment, occupation, exercise, or practice."

The word "crowd" is equally vague. The Working Group recommended deleting "crowd" because it was "too vague." What does "crowd the use of the sidewalk" mean? To fill it with people? To stand too close to it? Can one person acting alone do that? If not, why did the Council drop the "assemble or congregate" element and replace it with "alone or in concert with others"? Does it mean to crowd the personal space of "the use of the sidewalk"? If it means to crowd the personal space of other people on the sidewalk what is the standard? How much personal space is enough varies from person to person and is affected by variables such as class and culture. How Different Cultures Handle Personal Space, http://www.npr.org/sections/codeswitch/2013/05/05/181126380/how-different-cultures-handle-personal-space.

The verb "incommode" is not currently in regular usage except in the context of utility fixtures such as power lines and cell phone towers. See e.g., Sprint PCS Assets, L.L.C. v. City of Palos Verdes Estates, 583 F.3d 716, 721 (9th Cir. 2009). According to Google Ngram Viewer, incommode was used 76 times as often in 1742 as it was in 2000. The Supreme Court in Coates held an ordinance which makes it a criminal offense for "three or more persons to assemble . . . on any of the sidewalks . . . and there conduct themselves in a manner annoying to persons passing by . . . ." lacked standards because violation may entirely depend upon whether or not a policeman or some member of the public is annoyed. Coates v. Cincinnati, 402 U.S. 611, 614 (1971). The Court noted in passing that the Ohio Supreme Court had held that "annoy" was a synonym for "incommode." If annoy is unconstitutionally vague so is its synonym "incommode."

The word "incommode" also has two meanings, an emotional meaning of "to annoy" and a physical meaning of to "hinder, impede, "obstruct," as the District concedes. Memorandum, p. 12. The District contends that the context of the incommoding statute suggests that "incommoding" has a purely physical meaning. Memorandum, p. 12-13.

Au contraire says the 9th Circuit. In <u>Sprint PCS Assets</u> the question was whether a city could rely on purely aesthetic reasons to deny a phone company's application to build a cell tower on a picturesque city street when the phone company had the right to build a tower providing the tower did not "incommode the public use of the road or highway." <u>Sprint PCS Assets</u>, 583 F.3d at 721. The Court held that the City could rely on aesthetic considerations because "[t]o "incommode" the public use is to "subject [it] to inconvenience or discomfort; to trouble, annoy, molest, embarrass, inconvenience" or "[t]o affect with inconvenience, to hinder, impede, obstruct (an action, etc.)." <u>Sprint PCS Assets</u>, 583 F.3d at 723. The Court wrote, "The experience of traveling along a picturesque street is different from the experience of traveling through the shadows of a [tower], and we see nothing exceptional in the City's determination that the former is less discomforting, less troubling, less annoying, and less distressing than the latter." <u>Id.</u>

This definition makes clear that the incommoding statute gives the beat officer the authority to exclude people from the sidewalks for aesthetic reasons without setting any aesthetic standards, and the statute does not specify whose aesthetic standards should be used, the officer's or the other pedestrians, the very evil condemned in <u>Coates</u> and <u>Morales</u>. *See* <u>Coates</u>, 402 U.S. at 613; <u>Morales</u>, 527 U.S. at 70 (concurring)..

The District's contention, "whether the statue broadly reaches innocent conduct is irrelevant to a determination of whether it is unconstitutionally vague," Memorandum, p. 14, is contradicted by Supreme Court precedent and Circuit Court authority. The starting point of the <u>Morales</u> Court's analysis of the Chicago ordinance was the "broad sweep of the ordinance," which "does reach a substantial amount of innocent conduct." Morales, 527 U.S. at 60.

In <u>Desertrain</u> the plaintiffs challenged on vagueness grounds an L.A. ordinance which prohibits use of a vehicle "as living quarters either overnight, day-by-day, or otherwise." <u>Desertrain v. City of L.A.</u>, 754 F.3d 1147, 1149 (9th Cir. 2014). The <u>Desertrain</u> Court held that the record plainly showed that some of the conduct plaintiffs were engaged in when arrested — eating, talking on the phone, or escaping the rain in

their vehicles — "mimics the everyday conduct of many Los Angeles residents," 754 F.3d at 1157, yet

"appears to be applied only to the homeless." 754 F.3d at 1156. Writing for the whole panel Judge

Pregerson wrote, "The vagueness doctrine is designed specifically to prevent this type of selective

enforcement, in which a "net [can] be cast at large, to enable men to be caught who are vaguely undesirable

in the eyes of the police and prosecution, although not chargeable in any particular offense."Id. at 1156.

The D.C. Council rejected any limits on the meaning of the "move-on" stating its intent to allow the

warning to function as a bar order for someone who kept on returning after being ordered to move on, for

example, a homeless person who habitually blocked a store entrance. Committee Report, p. 7.

> 1.     City Council failed to use drafting techniques available to minimize
>        vagueness.

Supreme Court cases offer examples of many drafting techniques a legislative body can use to

defend statutes against vagueness challenges. The Working Group and subsequently the ACLU suggested

many of these techniques but the City Council rejected them.

For example, a legislative body can employ specialized definitions to clarify meanings. The CCE

proposed legislation used the term "blocking" but the City Council rejected it for being too narrow. In

hearings before the City Council held after the 2011 Amendments, in February, 2012, the ACLU suggested

that the statute be amended to add a definition of "incommoding" as "blocking an entire sidewalk so that

others cannot get past."

Many other statutes employ this drafting technique. The "Freedom of access to clinic entrances

Act, 18 U.S.C.A. § 248, solves a similar problem by defining the term "physical obstruction" as meaning

"rendering impassable ingress to or egress from a facility that provides reproductive health services or to or

from a place of religious worship, or rendering passage to or from such a facility or place of religious worship unreasonably difficult or hazardous."

Another "obstructing the sidewalk" statute which uses a definition section to narrow the scope of the operative language is the Seattle "pedestrian interference ordinance" discussed in <u>Webster</u>, 802 P.2d at 1337. The relevant definition section provides, "Obstruct pedestrian or vehicular traffic ... means to walk, stand, sit, lie, or place an object in such a manner as to block passage by another person or a vehicle, or to require another person or a driver of a vehicle to take evasive action to avoid physical contact." <u>Webster</u>, 802 P.2d at 1337.

The Model Penal Code version of an "obstructing the sidewalk" statute also uses the term "obstruction" but it has a definition section to cabin the reach of the word. <u>Id</u>. at § 250.7. The Model Penal Code uses the operative words, "obstructs any highway or other public passage, whether alone or with others." <u>Id</u>. at § 250.7. The statute continues, ""Obstructs" means renders impassable without unreasonable inconvenience or hazard."

Of course, the most common drafting technique to defend statutes against vagueness challenges is to include an appropriate *mens rea* requirement which is discussed below. The three statutes discussed above all have appropriate *mens rea* requirements.

    **B.   The text of the Incommoding Statute lacks limits on the arresting officers' discretion to issue move on orders and to make arrests because the statute lacks an appropriate *mens rea* requirement.**

The Supreme Court has never upheld a statute on a vagueness challenge under the modern doctrine without an appropriate *mens rea* requirement. The second step of the <u>Morales</u> analysis after a finding that the language is vague is an examination of the operative language to determine if it "necessarily entrusts lawmaking to the moment-to-moment judgment of the policeman on his beat." 527 U.S. at 60 *citing* <u>Kolender</u>. In <u>Morales</u>, since the text of the statute did not have a *mens rea* requirement and the

Illinois Supreme Court had declined to place a narrowing gloss on the ordinance, the only possible "limit" in the text to cabin an arresting officer's discretion in enforcement of the Chicago ordinance was the "dispersal" order element. A six Justice majority of the Morales Court held that the dispersal order in the vague ordinance did not place sufficient limits on the vague language in the absence of an appropriate *mens rea* requirement.

The incommoding statute also fails to place limits on the enforcement discretion of the arresting officers because the statute lacks an appropriate *mens rea* requirement. Moreover, in the absence of an appropriate *mens rea* requirement narrowing the vague language of the statute, the "move on" requirement does not cabin the police officer's enforcement discretion, it magnifies it. Morales, 527 U.S. at 60-64.

The District of Columbia Court of Appeals, the highest Court in the District of Columbia, and thus the final word on what the statute means, has definitively held that the D.C. Council stripped any *mens rea* element out of the statute in the 2011 amendments, Duffee, 93 A.3d at 1275-1276, and this Court is bound by that interpretation. Morales, 527 U.S. at 61; Smiley v. Kansas, 196 U.S. 447, 455 (1905).

The importance of a *mens rea* requirement in criminal statutes has gained greater significance since the Court's opinion this term in Elonis v. United States, 135 S. Ct. at 2011. Elonis holds that an intent element is required for very element in a criminal statute because it is a fundamental principal of common law that "the conventional requirement for criminal conduct—awareness of some wrongdoing." This is crucial in a statute governing conduct where "innocent intentional acts [of using the sidewalk] ... merely *consequentially* block sidewalk traffic or cause others to take evasive action." Webster, 802 P.2d at 1338.

Judge Catherine Blake has observed that "in general, only those anti-loitering ordinances interpreted as including a specific intent requirement have been upheld against both prongs of a vagueness challenge" because an appropriate *mens rea* requirement cabins a beat officer's "excessive discretion." NAACP Anne Arundel Cnty. v. City of Annapolis, 133 F. Supp. 2d 795, 808 (D. Md. 2001). The absence

or prescience of an appropriate *mens rea* requirement often makes the difference in whether the Supreme Court upholds or invalidates a statute in a vagueness challenge. <u>Morales</u>, *supra*, (lacking appropriate *mens rea* requirement); <u>Papachristou v. City of Jacksonville</u>, 405 U.S. at 163 (invalidating vagrancy statute without a *mens rea* element because the statute lacked "a specific intent to commit an unlawful act" element to protect them from being caught in the vagrancy net"); <u>Coates</u>, 402 U.S. at 614(lacking appropriate *mens rea* requirement); <u>Shuttlesworth v. Birmingham</u>, 382 U.S. 87 (1965) (lacking appropriate *mens rea* requirement). Cf. <u>Colten v. Kentucky</u>, 407 U.S. 104 (1972)(upholding vagueness challenge to disorderly conduct statute which did have an appropriate *mens rea* requirement).

C. **The "move on" element of the Incommoding Statute does not cabin the officer's discretion, it magnifies it.**

The Supreme Court has never upheld a statute against an "arbitrary and discriminatory" vagueness challenge with a dispersal order under its modern vagueness doctrine. The District's contention that plaintiffs' challenge to the move on order is really an as applied challenge, Memorandum, p. 16, misses the point of the vagueness doctrine and facial challenges as Justice Breyer meant in his concurrence in <u>Morales</u> when he wrote, "if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications." 527 U.S. at 71. Plaintiffs explain this point in detail below in the explanation of why <u>Shuttlesworth</u> *dicta* is disdintguishable.

In <u>Morales</u>, since the text of the statute did not have a *mens rea* requirement and the Illinois Supreme Court had declined to place a narrowing gloss on the ordinance, the only possible "limit" in the text to cabin an arresting officer's enforcement discretion was the "dispersal" order element. <u>Morales</u>, 527 U.S. at 61. The City argued that the "dispersal order" element placed a limit on the police enforcement discretion of the statute which saved it from being vague. <u>Morales</u>, 527 U.S. at 61. The <u>Morales</u> Court agreed that the requirement that the officer "**reasonably** believe" that a group of loiterers contained a gang member would place a sufficient limit on the arresting officer's authority to order dispersal and arrest ***but***

*only if* the ordinance had an appropriate *mens rea* requirement. Morales, 527 U.S. at 62. Therefore, the Morales Court held that as a result of the lack of a *mens rea* requirement such as a "harmful purpose" requirement to cabin the arresting officer's "vast discretion" conferred by the broad definition of "loitering," the requirement that the officer issue a dispersal order or move on order did not place a limit on the arresting officer's authority to order dispersal or a move on or a warning. Morales, 527 U.S. at 62. It magnified the discretion. Id. As a result, the decision to issue a warning or a move on order, *i.e.*, a decision to arrest, was "entrusted to the moment-to-moment judgment of the policeman on his beat." Morales, 527 U.S. at 62-63. Thus a dispersal order element even when cabined by a "reasonableness" limitation does not substitute for a *mens rea* requirement when the text of the statute is too broad. Morales, 527 U.S. at 62-63.

The District's "move[8] on" element not place a limit on the arresting officer's authority to order dispersal or a move on or a warning. *See* Morales, 527 U.S. at 62. Because the operative language of the incommoding statute is so extraordinarily broad, and because the statute lacks an appropriate *mens rea* requirement, the "move on" element does not substitute for a *mens rea* requirement and does not place a sufficient limit on the arresting officer's authority to order dispersal and arrest. See Morales, 527 U.S. at 62. Rather than cabining the arresting officer's discretion, the "move on" element of the incommoding statute magnifies it because it encourages arbitrary and capricious enforcement by police. *See* Morales, 527 U.S. at 62-63.

One take away from Morales on dispersal orders is that there is a distinction between using a dispersal order to **supplement** an adequate *mens rea* requirement by adding a dispersal order to a statute with an appropriate *mens rea* requirement because **used in conjunction** both drafting techniques narrow

---

[8] The District did not even defend the incommoding statute on the arbitrary and discriminatory enforcement prong so it did not argue that the "move on" element places a sufficient limit on the arresting officer's authority to order dispersal and arrest. But, even if they did, the argument would fail for the reasons the Morales Majority gave. 527 U.S. at 62.

the scope of a statute and place limits on a police officer's discretion to enforce the statute in an arbitrary and discriminatory manner.

That is what the drafters of the Model Penal Code did in their version of an "obstructing sidewalk" statute. The Model Penal Code version has **both** a "purposely or recklessly" *mens rea* requirement **and** a "move on" element.  Model Penal Code § 250.7. A dispersal order on top of a *mens rea* requirement would act as a brake on an arresting officer's impulse to arrest and cabins their discretion like adding a belt to braces. But using a "dispersal order" or a "move on" order by itself **in lieu of** a *mens rea* requirement when an ordinance is vague magnifies the vagueness of the ordinance by delegating all enforcement discretion to the arresting officer rather than limiting it. This is also what the ACLU and the law enforcement officer group (OAG/MPD/US Attorney's Office) suggested. Committee Report, p. 52-52 (ACLU); p. 88-89 (OAG/MPD/US Attorney's Office, for the use of sidewalks prong).

> a.   **The "move on" element of the Incommoding Statute; the "move on order" element adds even less to the Incommoding Statute in the way of limits than the dispersal order added to the Chicago loitering statute.**

As the District explains, "Initially, to be convicted under D.C. Code § 22-1307(a), a person must have disregarded a law enforcement officer's instruction to move." Memorandum at 18. The actual text of the "move on" element reads as follows: "to continue or resume the crowding, obstructing, or incommoding **after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding**." (emphasis added). Thus, the "trigger" that authorizes an arrest is the person's refusal to "move on." D.C. Code § 22-1307(a). **The fact that the ordinance does not permit an arrest until after an individual has been requested to move on does not provide any guidance to the officer as to whether a request should be made in the first place.** Leal v. Town of Cicero, 2000 U.S. Dist. LEXIS 5860, *7-8 (N.D. Ill. Mar. 31, 2000).

The language of the statute uses the words, "after being instructed by a law enforcement officer to cease the crowding, obstructing, or incommoding," rather than the actual words, "move on." Id. But, in

actual practice the police issue a "move on" order rather than a "cease incommoding" order as the District's characterization of the provision in its Memorandum makes clear. Id. p. 18. For example, the orders the arresting officers gave plaintiffs were some variation of a move on order: Mr. Agnew, ¶ 95; Mr. Bugg Bey, ¶ 116; Mr. Dennis, ¶ 140; Ms. Williamson, ¶ 158, 169. In fact, the arresting officers arrested Mr. Bugg Bey because ""he was one staying, not leaving," ¶ 126.

The move on order adds even less to the incommoding statute in the way of limits than the dispersal order added to the Chicago loitering statute. Under the Chicago loitering statute an arresting officer had no authority to issue a dispersal order unless the officer "reasonably believes that one of the loiterers is a member of a criminal street gang." Morales, 527 U.S. at 61. The Court conceded that the requirement that the officer reasonably believe that a group of loiterers contains a gang member does place *some* (but not enough) limit on the authority to order dispersal. Morales, 527 U.S. at 62.

But, the move on provision in the incommoding statute has no such standard to place a limit on the police officer's authority to order a person to move. D.C. Code § 22-1307(a). The incommoding statute functions as a loitering statute because there is so little linkage between the vague text of the statute and the officer's authority to issue a move on order.

The officer does not even need probable cause to believe that a pedestrian is crowding, obstructing, or incommoding before issuing a move on order. Summary judgment opinion, Bey v. District of Columbia, 2014 CA 3511 B (HBD), August 7, 2015, p. 8, n5 [21-3, Bey SJ order]. Judge Dixon wrote in his summary judgment opinion denying qualified immunity to the officer who arrested Mr. Bugg Bey that that he was "uncertain about what is the appropriate legal standard of proof needed by [an officer] to demonstrate the reasonableness" of their move on order in the first instance. Id. If a jurist of Judge Dixon's stature and long experience is uncertain about what is the appropriate legal standard of proof then how would the "cop on the beat" know?

Moreover, as a practical matter, the move on order substitutes an analysis of whether a person is violating the incommoding statute with a separate and independent dispute over whether a person has to obey a move on order. A person has no obligation to follow every order a police officer issues. It is not automatically unlawful for a person to refuse to follow a police officer's every order. *See e.g.*, <u>Wilson</u>, 549 Fed. Appx. at 311 (no probable cause to arrest the plaintiff for obstruction for failure to comply with an order because "the officers had no legal basis to order [plaintiff] to stop in the first place."; <u>Streit</u>, 26 A.3d at 319-20 (conviction for failure to obey a "lawful order" (FTO) under 18 DCMR § 2000.2 (2006) reversed because the officer's the order to disperse was not "lawful" ).

Moreover the "FTO" regulation has two limits on its face the incommoding statute lacks -- the order must be (1) lawful; and (2) relate to traffic. The move on order has no limiting language; it is not even limited as to time. In fact, the D.C. Council indicated in the Committee Report that the order would persist like a barring notice in (unspecified) certain circumstances **for example, a homeless person who habitually blocked a store entrance.** Committee Report, p. 7.

At the end of the day, there is nothing to prevent the District from adding a "move on" requirement as an additional element to ***supplement*** an adequate *mens rea* requirement to place additional limits on a police officer's discretion to enforce the statute in an arbitrary and discriminatory manner. That's what the drafters of the Model Penal Code version of an "obstructing sidewalk" statute did. The Model Penal Code version has both: a "purposely or recklessly" *mens rea* requirement and a "move on" element.  Model Penal Code § 250.7. A move on order on top of a *mens rea* requirement would act as a brake on an arresting officer's impulse to arrest and cabins their discretion like adding a belt to braces. But the City Council compounded the vagueness of the incommoding statute by inserting the "move on" **in lieu of** a *mens rea* requirement. This is also what both the ACLU and the OAG/MPD/US Attorney's Office proposal suggested. Committee Report, p. *52-53*; 88-89

### D.   Other district courts have held that loitering or "obstructing" statutes with "move on" orders instead of *mens rea* requirements violate the 5th Amendment.

Other district courts have held that loitering or "obstructing" statutes with "move on" orders instead

of *mens rea* requirements violate the "arbitrary and discriminatory" prong of void for vagueness doctrine.

In <u>Leal v. Town of Cicero</u>, 2000 U.S. Dist. LEXIS 5860 (N.D. Ill. Mar. 31, 2000) the district court held

that an "obstructing" statute which read, in its entirety, "No person shall obstruct or encumber any street

corner or other public place in the town by lounging in or about the same after being requested to move on

by any police officer." The Court held that the statute violated both prongs of the void for vagueness

doctrine.

The plaintiff contended that the Cicero ordinance suffered from the same flaw as the provision of

Alabama law [Section 1142] the Supreme Court invalidated in <u>Shuttlesworth</u> because the legality of a

person's conduct turns on whether a police officer has requested the person to move.

> The Cicero ordinance makes obstructive or encumbering lounging the unlawful activity.
> However, that activity does not become unlawful until after a police officer has requested
> the individual to move. Therefore, the triggering activity is the officer's request. The
> ordinance creates two significant problems: one of notice to an individual as to how to
> conform his or her behavior; and one of guidelines to police officers as to the enforcement
> of the ordinance.

<u>Leal</u>, at pgs. 5-6.

The <u>Leal</u> Court agreed with the <u>Morales</u> plurality that rejected Chicago's argument that an

"individual receives adequate notice as to what behavior is unlawful from the dispersal order itself" because

an individual is not subject to sanction until he or she has failed to comply with the dispersal order because

that was a form of bootstrapping. <u>Leal</u>, at pgs. 6-7. If the loitering is itself harmless, then "the dispersal

order itself is an unjustified impairment of liberty." <u>Leal</u>, at p. 7.

The <u>Leal</u> Court also agreed with the <u>Morales</u> majority that the second prong of the

vagueness doctrine -- dealing with arbitrary and discriminatory enforcement -- was violated because under

the language of the ordinance, police officers have complete discretion to decide who they will request to "move on" (whatever that terminology may mean). Leal, at pgs. 7-8. **The fact that the ordinance does not permit an arrest until after an individual has been requested to move on does not provide any guidance to the officer as to whether a request should be made in the first place.** Focusing on the risk of "discriminatory" enforcement inherent in a vague statute without such guidelines, the Court found that the public is at risk of having a police officer treat two individuals differently though they are engaged in the same conduct. Leal, p. 8. The Leal Court focused on the fact that a white officer had issued a move on order to a Latino youth. Id. This is exactly the problem presented by the MPD enforcement of the incommoding statute against young Black men and other African Americans, TAC ¶ 51-53, 105-120, and this is why the doctrine is perfectly suited to cure the problem. For example, Officer Norton acted with racial animus and the vagueness in the statute allowed him to use it as a pretext to arrest Mr. Dennis and Mr. Agnew. TAC ¶ 66-67. Moreover, the Court can take judicial notice of the fact that it is frequently used in areas when gentrification is occurring and the police are pushing out longtime residents, and the poor, and the homeless, the sort of people whom many of the new gentrifiers consider "undesireable." Papachristou, 405 U.S. at 171, and the homeless. Desertrain, 754 F.3d at 1156 (striking down on vagueness grounds – bath prongs - statute selectively applied to the homeless).

In NAACP Anne Arundel County Branch v. City of Annapolis, 133 F. Supp. 2d 795 (D. Md. 2001), which held unconstitutional Annapolis, Maryland's Drug-Loitering Free Zones Ordinance, the court found that the ordinance was void on both prongs of the vagueness doctrine in large part because the ordinance lacked an appropriate *mens rea* requirement and had a dispersal order element in lieu of a *mens rea* requirement. Id. at 797-798, 801. The ordinance allowed residents or neighborhood associations to submit applications to the city council to have neighborhoods where previous drug arrests had been made declared "drug-loitering free zones." In these areas, police officers could order the dispersal of those who were "behaving in a manner indicating that the person is . . . engaging in drug-related activity" as demonstrated by a series of enumerated acts. Id. at 797-98.

Judge Catherine Blake has observed that "in general, only those anti-loitering ordinances interpreted as including a specific intent requirement have been upheld against both prongs of a vagueness challenge" because an appropriate *mens rea* requirement cabins a beat officer's "excessive discretion." NAACP Anne Arundel Cnty. v. City of Annapolis, 133 F. Supp. 2d 795, 808 (D. Md. 2001).

E.    The <u>Shuttlesworth</u> case supports plaintiffs' position as the <u>Leal</u> Court held.

Shuttlesworth v. Birmingham, 382 U.S. 87 (1965) supports plaintiffs position and illustrates the vagueness inherent in the term "obstruct" as used in a "obstructing" the sidewalk statute similar to the District's incommoding statute. The City of Birmingham, Alabama had an ordinance (Section 1142) setting out two separate and disjunctive offenses which read:

> "It shall be unlawful for any person or any number of persons to so stand, loiter or walk upon any street or sidewalk in the city as to obstruct free passage over, on or along said street or sidewalk. It shall also be unlawful for any person to stand or loiter upon any street or sidewalk of the city after having been requested by any police officer to move on." § 1142.

Shuttlesworth, 382 U.S. at 88.

Mr. Shuttlesworth was arrested because he was part of a group of between ten to twelve people congregating on a downtown sidewalk outside a Birmingham, Alabama department store. 382 U.S. at 89.[9] An officer approached the group and told them to move on. Some but not all began to move and then the officer repeated his order and ultimately only Mr. Shuttlesworth was left standing on the sidewalk. Id. Mr. Shuttlesworth then walked into a store and the officer followed him into the store and arrested him. 382 U.S. at 89. As the majority, Id. at 90 n.3, and one concurrence pointed out, Id. at 101-102, the arrest occurred during an economic boycott by the city's African American community protesting racial

---

[9] Mr. Shuttlesworth was also convicted under a second ordinance, Section 1231, which was an unqualified FTO statute.

discrimination and this concurrence believed quite strongly that the boycott motivated the arrest or Mr.

Shuttlesworth. Id. at 102.

The Court did not comment on the first sentence of Section 1142 which is quite similar to the

former version of the District's incommoding statute minus the "congregating" language and the Adams

"breach of the peace" gloss. ["It shall be unlawful for any person or any number of persons to so stand,

loiter or walk upon any street or sidewalk in the city as to obstruct free passage over, on or along said street

or sidewalk.]

But, the Court held that the second sentence of Section 1142, "It shall also be unlawful for any

person to stand or loiter upon any street or sidewalk of the city after having been requested by any police

officer to move on," standing alone, was unconstitutional because "the second part of this ordinance says

that a person may stand on a public sidewalk in Birmingham only at the whim of any police officer of that

city." Shuttlesworth, 382 U.S. at 90. Therefore, it was so broad that it "does not provide for government by

clearly defined laws, but rather for government by the moment-to-moment opinions of a policeman on his

beat." Id.

Moreover, the Court also discussed a version of Section 1142 as it had been narrowly construed by

the Court of Appeals of Alabama two years after Mr. Shuttlecock's conviction. 382 U.S. at 92-93. Under

the explicitly narrowed construction of Section 1142, "the mere refusal to move on after a police officer's

requesting that a person standing or loitering should do so is not enough to support the offense." The

Court of Appeals of Alabama held, "There must also be a showing of the accused's blocking free passage" .

. . on or along a street or sidewalk by the manner in which a person accused stands, loiters or walks

thereupon. Shuttlesworth, 382 U.S. at 91. The Shuttlesworth Court discussed the application of this version

to Mr. Shuttlesworth's case because it was not clear which version of the statute the trial court had applied.

Id.

One interesting point is that the Alabama Court in its gloss replaced "obstruct" with the narrower term, "block." The D.C. Council named the incommoding statute the blocking of passages" statute but the Council expressly rejected the proposal to replace "crowd, obstruct, or inconmode" with "block." Committee Report, p. 6-7.

The other is the vagueness in the statute as pointed out by the concurrences's application of the statute to facts of Mr. Shuttlesworth's case. As construed by the Alabama Court, Section 1142 makes it unlawful to continue to obstruct the free passage over the sidewalk after a police warning to move on. 382 U.S. at 96. Yet, as Justice Douglass pointed out, Mr. Shuttlesworth was arrested after he had moved on. This is also the fact pattern in Mr. Bugg Bey's case. Officer Onoja arrested him an hour after his first order without a second order, and after everyone else had dispersed. As Justice Douglass pointed out, the arrest was only valid if one person standing on a downtown sidewalk can be said to block the sidewalk. But Ms. Williams  and Mr. Dennis were both arrested under the incommoding statute for standing alone on a city street and a passageway respectively. Mr. Agnew was arrested for standing on the stoop when no one else was around. An the young man in Starburst plaza

Justice Fortas pointed out that even if Mr. Shuttlesworth was with ten other people at 10:30 a.m. their group only occupied one-half of the sidewalk, and there is no suggestion of disorder or of deliberate obstruction of pedestrian traffic. 382 U.S. at 100. The Alabama Court narrowed "obstruct" to "block" and still Mr. Shuttlesworth and his group were ordered to move on even though half of the sidewalk was free. But, the Council rejected the term block and instead retained the word "obstruct," because "The term "obstruct" appears in the dictionary to be a broad term that includes "impede," "hinder," and "block."" So, obstruct does not mean only obstruct, it also "includes "impede," "hinder," and "block.""

The narrowly construed version of Section 1142 is quite similar to the current version of the District's incommoding statute. The <u>Shuttlesworth</u> Court stated in *dicta* that, "As so construed, we cannot say that the ordinance is unconstitutional, though it requires no great feat of imagination to envisage

situations in which such an ordinance might be unconstitutionally applied." The sentence is *dicta* because it amounts to an advisory opinion because appellant Shuttleworth had been convicted under the statute two years before the Alabama Court of Appeals imposed its narrowing construction on Section 1142 so there was no "case or controversy" arising under the narrowed Section 1142 in Mr. Shuttleworth's appeal.

But, it is doubtful that a statute (even as narrowed by the Alabama Court of Appeals) of which the Supreme Court can say that "it requires no great feat of imagination to envisage situations in which such an ordinance might be unconstitutionally applied" would pass muster under a Morales analysis. Shuttlesworth is one of the first "void for vagueness cases and the doctrine has evolved a great deal since then. In fact, the Supreme Court did not introduce the arbitrary and discriminatory enforcement prong of the vagueness doctrine until three years later in when the arbitrary and discriminatory enforcement prong first appeared as a component of the vagueness analysis equal in prominence to the threat of lack of notice in Papachristou, 405 U.S. 156. Andrew E. Goldsmith, The Void-for-Vagueness Doctrine in the Supreme Court, Revisited, 30 Am. J. Crim. L. 279, 288 (2003). Not until 1983 in Kolender v. Lawson, 461 U.S. 352 (1983), did the Court announce the two-pronged test that stands today: "the void-for-vagueness doctrine requires that a penal statute define the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and [2] in a manner that does not encourage arbitrary and discriminatory enforcement." The Void-for-Vagueness Doctrine in the Supreme Court, Revisited, 30 Am. J. Crim. L. at 288.

Also, the extent to which the distinction between "as applied" and "facial" challenges to statutes still applies when the test of vagueness is whether a "statute define[s] the criminal offense with sufficient definiteness that ordinary people can understand what conduct is prohibited and in a manner that does not encourage arbitrary and discriminatory enforcement." Kolender v. Lawson, 461 U.S. 352, 357 (1983).

According to the <u>Kolender</u> Court, the test of vagueness under the second prong of the doctrine is whether a "statute define[s] the criminal offense ... in a manner that does not encourage arbitrary and discriminatory enforcement." <u>Kolender v. Lawson</u>, 461 U.S. 352, 357 (1983). This formulation of the doctrine swallows up any distinction between "as applied" and "facial" challenges to statutes under the second prong of the vagueness doctrine.

This what Justice Breyer meant in his concurrence in <u>Morales</u> when he wrote, "if every application of the ordinance represents an exercise of unlimited discretion, then the ordinance is invalid in all its applications." 527 U.S. at 71. As he pointed out, the ordinance violated the Constitution because it delegated too much discretion to a police officer to decide whom to order to move on, and in what circumstances. He saw no way to distinguish in the ordinance's terms between one application of that discretion and another.

Moreover, the Alabama Court of Appeals stressed that the mere refusal to move on after a police officer's requesting that a person standing or loitering should do so without a showing of the accused's actually blocking free passage was not enough to support the offense. <u>Shuttlesworth v. Birmingham</u>, 382 U.S. at 91.

Also, Section 1142 as narrowly construed is a much narrower statute than the incommoding statute. The incommoding statute criminalizes "crowding, obstructing, or incommoding" whereas the narrowly construed Section 1142 criminalized only "blocking," a much narrower term. Finally, after <u>Morales</u> and <u>Elonis</u> Section 1142 even as narrowed by the Alabama Court of Appeals would not be upheld without a *mens rea* requirement.

## V.     Incommoding Statute Violates Due Process Because It Lacks An Appropriate *Mens Rea* Requirement

An additional, independent, reason for denying the defendant's motion to dismiss is that the incommoding statute violates due process because it lacks an appropriate *mens rea* requirement on each element, Claim 1 and Claim. Elonis v. United States, 135 S. Ct. at 2011. Elonis holds that an intent element is required for very element in a criminal statute because it is a fundamental principal of common law that "the conventional requirement for criminal conduct—awareness of some wrongdoing." This is crucial in a statute governing conduct where "innocent intentional acts [of using the sidewalk] ... merely *consequentially* block sidewalk traffic or cause others to take evasive action." Webster, 802 P.2d at 1338. Although the Elonis Court did not expressly hold that a criminal statute without an appropriate *mens rea* requirement on each element of the statute violates due process, it implicitly reached that holding when it held that except in the regulatory context, the "general rule" is that a guilty mind is "a necessary element in the indictment and proof of every crime." Elonis, 135 S.Ct. at 2009. Even the Supreme Court cannot impose a limiting construction on a state statute or ordinance that a state's highest court has declined to adopt. Morales, 527 U.S. at 61. Therefore, the incommoding statute ciolates due process because it lacks an appropriate *mens rea* requirement.

## VI.    The District Is Liable For Injuries Caused By Enforcement Of The Incommoding Statute

Because the incommoding statute is an official policy of the government of the District of Columbia the District is liable for injury it caused people by enforcing the unconstitutional statute including arresting people, Fields v. City of Omaha, 810 F.2d 830 (8th Cir. 1987), and prosecuting them, Lederman v. United States, 539 F. Supp. 2d 1,4 (D.D.C. 2008)(District liable in § 1983 because its prosecutors elected to prosecute person arrested under an unconstitutional statute); Faustin v. City & Cnty. of Denver, 268 F.3d 942, 947-48 (10th Cir. 2001) (First Amendment plaintiff "has standing to sue for damages based on her prosecution (including nominal damages, which she sought)" even though "the section 3-1 [bill posting] charge against Faustin was dismissed . . . and she is not being prosecuted under section 3-1 at this time.") *subsequent history not affecting rationale*. Plaintiffs also incorporate by reference their arguments on this

issue and why they have a § 1983 damages claim from their supplemental opposition. [30]. The District is simply wrong here.

The District is also liable for any arrest or prosecution taken under the state by any other agency because the incommoding statute is a policy of the government of the District of Columbia and that policy is the moving force behind injuries caused by enforcement of the statute. <u>Monell v. Dep't of Soc. Servs. of the City of New York</u>,436 U.S. 658, 694, (1978)  <u>Monell</u> established that proving that a municipal policy or ordinance is itself unconstitutional is always sufficient to establish the necessary causal connection between the municipality and the constitutional deprivation. <u>Id</u>.; <u>Amnesty Am. v. Town of W. Hartford</u>, 361 F.3d 113, 125 (2d Cir. 2004). An officer making arrests under a District of Columbia statute or a prosecutor prosecuting a District of Columbia executes the District's policy or custom. <u>Lederman v. United States</u>, 539 F. Supp. 2d 1, 4 (D.D.C. 2008).

The presence or absence of probable cause to arrest plaintiffs under the statute is irrelevant. Plaintiffs' constitutional claim does not stem from an absence of probable cause to arrest, but from the alleged unconstitutionality of the statute justifying the arrest. <u>Grossman v. City of Portland</u>, 33 F.3d 1200, 1203 (9th Cir. Or. 1994)(); Thus, plaintiffs' "prosecution claim" is different from a malicious prosecution claim which challenges the evil motive of the prosecutor and requires a plaintiff to show the absence of probable cause. <u>Lederman v. United States</u>, 539 F. Supp. 2d 1,4 (D.D.C. 2008).

Any qualified immunity the arresting officers may have does not extend to the District. <u>Lederman v. United States</u>, 2007 U.S. Dist. LEXIS 27,521, *14-15 (D.D.C. Apr. 13, 2007) *citing* <u>Owen v. City of Independence</u>, 445 U.S. 622, 650-52 (1980) (discussing and rejecting the argument that personal immunity may be extended to a municipal corporation); <u>Singh v. District of Columbia</u>, 55 F. Supp. 3d 55, 75 (D.D.C. 2014). Nor does any "prosecutorial" immunity extend to the District. <u>Lederman</u>, 539 F. Supp. 2d 4.

Finally, out-of-Circuit cases such as <u>Richardson v. South Euclid</u>, 904 F.2d 1050 (6th Cir. 1990) and

<u>Reyes v. City of Lynchburg</u>, 300 F.3d 449, 458 (4th Cir. Va. 2002) holding that defending against a

prosecution brought under an unconstitutional statute does not state a claim under the 5th Amendment are

both non-persuavsive and distinguishable. First, <u>Richardson</u> and <u>Reyes</u> have not been universally followed.

*See e.g.,* <u>Hoekstra v. City of Arnold</u>, 2009 U.S. Dist. LEXIS 7465, *22-23 (E.D. Mo. Feb. 3, 2009).

Moreover, other Circuits have reached the opposite result. *See e.g.,* <u>Faustin</u>, 268 F.3d at 947-48.

But, most importantly, the cases are poorly reasoned. In <u>Richardson</u>, 904 F.2d 1050 the

Richardsons argued that the injuries they suffered as a result of South Euclid's unsuccessful prosecution

amounted to a constitutional deprivation under the due process. <u>Id</u>. at 1052. The 6th Circuit denied the

claim on the theory that "the Fourteenth Amendment does not protect against all deprivations of liberty. It

protects only against deprivations of liberty 'accomplished without due process of law,'" relying on <u>Baker v.</u>

<u>McCollan</u>, 443 U.S. 137, 145 (1979). <u>Reyes</u> followed the rationale of <u>Richardson.</u>

Both <u>Reyes</u> and <u>Richardson</u> have well-reasoned dissents.

<u>Baker v. McCollan</u> is 100% distinguishable from a claim of wrongful prosecution under an

unconstitutional statute. In <u>Baker</u> the Supreme Court held that a sheriff who held a person, Mr. Baker,

who was arrested on a "wrong warrant" (*i.e.,* a warrant directed to someone else, in this case Baker's

brother who had obtained a copy of Baker's license identical in every respect to Baker's license except for

the picture) for three days over a New Year's weekend before investigating Baker's protestations of

innocence did not violate the due process clause. The Sherriff was a law enforcement officer and Mr.Baker

was arrested pursuant to a valid warrant and placed in his jail on the basis of that warrant. The only issue

was Mr. Baker the person named in the warrant.

Plaintiffs' wrongful prosecution claim is completely different. A prosecutor, an expert on the

incommoding, at his or her leisure, after consulting with the arresting officer and reviewing the file, chose to

initiate a prosecution of plaintiffs. The claim in Baker was that the Sherriff should have been quicker about commencing an investigation about Mr. Baker's claims of innocence. The prosecutors in this case acted at their leisure. Promptness was not an issue. The gravamen of their claim is not that the prosecutors acted too slowly but that they, after deliberation, prosecuted plaintiffs under an unconstitutional statute.

## VII.    Conclusion.

Wherefore, for the reasons stated above, plaintiffs respectfully ask this Court to deny defendant's motion [37] to dismiss their Third Amended Complaint [35].

| | |
|---|---|
| Respectfully submitted,<br><br>/s/ William Claiborne<br>WILLIAM CLAIBORNE<br>D.C. Bar # 446579<br><br>Counsel for plaintiffs on behalf of themselves and the putative class members<br><br>2020 Pennsylvania Ave., N.W<br>Suite 395<br>Washington, DC 20006<br>Phone 202/824-0700<br><br>Email clairbornelaw@gmail.com | Respectfully submitted,<br><br>/s/ Michael Bruckheim<br>MICHAEL BRUCKHEIM<br>D.C. Bar # 455192.<br><br>Counsel for plaintiffs on behalf of themselves and the putative class members<br><br>1 Church St, # 910<br>Rockville, MD 20850<br>Phone (240) 753-8222 |
| Respectfully submitted,<br><br>/s/ Lynn E. Cunningham<br>LYNN E. CUNNINGHAM<br>DC Bar # 221598<br><br>Counsel for plaintiffs on behalf of themselves and the putative class members<br><br>306 Westview Drive,<br>Dubois, WY 82513<br>Phone: 307-431-4158 | |

| Email: lcunningham@law.gwu.edu | |
|---|---|